UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD SHORT #277467,

                Plaintiff,             Civil Action No. 13-13246
                                        Honorable Matthew F. Leitman
                                        Magistrate David R. Grand

    v.

JOHN KELLY, *et al.*,

                Defendants.
_____/

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [13]

**I.     RECOMMENDATION**

Before the Court is Defendants John Kelly and Valerie Hull's ("Defendants") motion for summary judgment. [13]. This case has been referred to this Court for all pre-trial proceedings pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). For the following reasons, the Court RECOMMENDS that Defendants' motion [13] be GRANTED in part as to all claims against defendant Hull and the claim against defendant Kelly for retaliation based on writing a misconduct ticket, but DENIED IN PART regarding the claim against Defendant Kelly for participating in Short's transfer to another prison in retaliation for filing a grievance against him.

**II.     REPORT**

    **A.    Factual Background**

The following facts are not in dispute, except where noted. At all relevant times, Short was incarcerated at the Central Michigan Correctional Facility in St. Louis, Michigan, where Defendants Hull (a Corrections Officer) and Kelly (an Assistant Resident Unit Supervisor) were employed. On July 9, 2012, Short filed a grievance against Kelly, alleging in pertinent part that

Kelly addressed him "in a mocking manner with falsetto laughter" which amounted to degrading, defamatory and otherwise inappropriate conduct. [13-2 at 6]. The grievance was assigned to Officer Brian Pung for review and determination. At some point prior to issuing his findings, Officer Pung gave the grievance to Kelly. Short alleges that Kelly shared the grievance with several other staff members, including Defendant Hull. Kelly avers that the grievance sat in his "to do" tray for "a number of days" and that since he shares an office with six people, he cannot prevent them from looking in his tray when he is not in the office. Hull denies ever seeing the grievance.

It is undisputed that Kelly reviewed the grievance and looked up the word "falsetto" in the dictionary to learn its meaning. Short avers that after reviewing the grievance, Kelly pulled him into his office in the company of Hull and denied having made the alleged statements. Short avers that Hull told Kelly that she believed Short was mocking him by stating that he laughs like a girl. Short avers that he denied that he was mocking Kelly in his grievance. Hull denies having participated in this meeting.

On July 20, 2012, Kelly provided Officer Pung with a written response to the grievance, denying having addressed Short in the manner alleged, and claiming that Short's reference to "falsetto laughter" was itself derogatory and that he felt that "it met the requirement of Insolence according to PD 03.03.105," [13-2 at 3], which states that "words, actions or other behavior which is intended to harass, degrade, or cause alarm in an employee" is a class II misconduct. *Id.* The code then gives the example of "using abusive language to refer to an employee; writing about or gesturing to an employee in a derogatory manner." [*Id.* at 26]. On the same day, Kelly wrote a misconduct ticket against Short for insolence. The misconduct ticket was pulled by Warden Birkett on July 22, 2012, and, due to the six-month retention policy, is no longer

available for review.

Short alleges that on July 25, 2012, Hull solicited several prisoners in Short's housing unit to assault him, in retaliation for his writing a grievance against Kelly. However, he does not allege that he was actually assaulted. Hull, via affidavit, denies having any knowledge of the grievance filed against Kelly, denies having solicited prisoners to assault him, and denies having received a grievance from Short or being asked to respond to a grievance he filed against her. She also denies having been contacted by a supervisor regarding her conduct.

Short also alleges that on August 24, 2012, he was unlawfully transferred from the St. Louis facility to another prison. [1 at 5]. Specifically, he alleges:

> On August 24, 2012, I was transferred to another facility in retaliation for having "burned his bridges" with [] Kelly over the issue of his continued retaliation over the original filing of the grievance in July. My transfer was done at his request, even though I was employed in a sensitive position as Front House Porter, serving on the Warden's Form and was not due for an annual review and screening for months at the time he completed the Transfer Screen.

[*Id.*].

In his motion for summary judgment on this topic, Kelly did not address the implication of the foregoing allegations, which (accurate or not) is that, due to his porter job and pre-annual review/screening status, Short should not have been subjected to a "transfer screen" or have been transferred in August 2012. Instead, Kelly simply averred that the transfer itself was not the result of retaliation, pointing to a record of Short's transfer from the St. Louis facility to one in Jackson, which was approved by the Central Office Transfer Coordinator, Laura Heinritz, and was completed in accordance with Prison Directive 05.01.140 "Prisoner Placement and Transfer". [13-2 at 28]. The transfer record states that the Jackson facility was transferring a protection prisoner to the St. Louis facility, and that St. Louis was offering Short in exchange.

3

*Id.*

**B.      Procedural Background**

Short filed the instant complaint, alleging retaliation against both Kelly and Hull, as well as several other defendants already dismissed from this action on initial screening, for acts he alleged they undertook as a result of his filing a grievance against Kelly.  [1, 6].  While not specifically alleged, it is presumed Short's claims are brought pursuant to 42 U.S.C. § 1983.  He sues Kelly and Hull in both their official, as well as their individual, capacities.  He seeks as relief transfer back to his prior facility, reinstatement of his work assignment, bunk and housing unit assignment, payment of back wages and hardship pay, an order requiring the reconsideration of his parole, the issuance of a restraining order against the Michigan Attorney General's office preventing it from representing the defendants due to "the possible criminal violations of alleged Ethnic Intimidation . . . and Solicitation of Assault," and punitive damages.  [1 at 3].

On February 14, 2014, Kelly and Hull filed a motion for summary judgment, arguing that they are entitled to judgment as a matter of law because there is no issue of material fact that they acted in retaliation against Short.  [13].  Attached to their motion are affidavits from both Kelly and Hull, specifically denying all the allegations in the complaint.  [13-1, 2].  On June 6, 2014, Short responded to the motion, and attached several exhibits, including an affidavit of his own, which was originally filed as part of his grievance on the matter, and thus only mentions the conduct of Kelly as it relates to his writing of a misconduct ticket in response to Short's initial grievance.  [21 at 32-33].  It does not mention either Hull's alleged assault solicitation or Kelly's alleged participation in a prison transfer, as both of those alleged incidents occurred after the date of this affidavit (July 22, 2012).  *Id.*.

Short further argues that summary judgment is inappropriate here where discovery has

4

not yet been undertaken.  He argues that his transfer has prevented him from obtaining the evidence necessary to rebut Defendants' statements, and that further discovery and evidence (including evidence he said was lost in the transfer and/or seized by the MDOC) would reveal issues of material fact that would prevent the entry of summary judgment.  Short does not specify exactly what evidence he lost that would support his arguments, nor what other evidence he would need to obtain to rebut Defendants' arguments, other than stating it would consist of "sworn statements" of staff and prisoners.  [21 at 3, 5, 7].  Defendants did not file a reply.

### C.    Legal Standard

Federal Rule of Civil Procedure 56 provides that "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  In determining whether a genuine issue of material fact exists, the court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

In response to a summary judgment motion, the opposing party may not rest on its pleadings nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). Indeed, "'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Id*. (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id*. at 560 (citing *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

Here, Defendants Kelly and Hull assert that they are entitled to qualified immunity. Under the doctrine of qualified immunity, governmental officials performing discretionary functions are shielded from civil liability unless their conduct violates a clearly established constitutional right. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is premised upon the avoidance of unnecessary burdens of litigation, and therefore the privilege is immunity from suit and not a mere defense to liability. *See Saucier v. Katz*, 533 U.S. 194, 200 (2001). Determining the applicability of qualified immunity requires a two-step inquiry into whether the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *See Saucier*, 533 U.S. at 201. In conducting this inquiry, the court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *see also Bishop v. Hackel*, 636 F.3d 757,

6

772 (6th Cir. 2011). With respect to the second prong of the test for qualified immunity, "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation that he confronted." *Saucier*, 533 U.S. at 202.

### D.    Analysis

Short alleges that Defendants took actions against him in retaliation for his filing a grievance against defendant Kelly, in violation of the First Amendment. Retaliation against a prisoner in response to his or her exercise of a constitutional right violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth First Amendment retaliation claim, Short must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that protected conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Later Sixth Circuit case law has more specifically held that a plaintiff must prove that the exercise of a protected right was not only part of the motivation, but a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (*citing Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

In addition, not only must the plaintiff set forth that an adverse action was taken against him, but that the adverse action actually resulted in an injury or consequence to the plaintiff. *See Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 584 (6th Cir. 2012) (where adverse action resulted in no consequences for plaintiff and where only allegation of injury was emotional, court found allegations insufficient to state a claim for First Amendment retaliation). Generally, whether an adverse action is sufficient to deter a person of ordinary firmness is a question of fact. *Id.* at 583-

7

84.   However, "[t]he analysis of this factor must be tailored to the circumstances such that prisoners might have to endure more than public employees, who in turn might have to endure more than the average citizen." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010).  "[T]rivial inconveniences and minor slights will not amount to an adverse action." *Hazel v. Quinn*, 933 F. Supp. 2d 884, 890 (E.D. Mich. 2013).

### 1.   *Defendants in Their Official Capacities*

The Court first addresses Short's claims against Defendants in their official capacities. The Eleventh Amendment bars suit against the state of one of its agencies in federal court unless the state has given express consent, regardless of the relief sought.  *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984) *overruled in part on other grounds*, *Will v. Mich. Dep't. of State Police*, 491 U.S 58 (1989).  The State of Michigan has not consented to civil rights suits in the federal courts.  *See Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). The Sixth Circuit has held that since an official capacity suit for retroactive relief, such as monetary damages, is deemed to be against the State, whose officers are the nominal Defendants, the claim is barred by the Eleventh Amendment.  *Doe v. Wiggington*, 21 F.3d 733, 736-37 (6th Cir. 1994).  Therefore, any claims against Defendants in their individual capacities do not state a claim upon which relief can be granted and must be dismissed.  *See Will*, 491 U.S. 58 (1989) (claims against a state agency or an official in his/her official capacity are claims against the state, and are not claims against a "person" subject to Section 1983 liability).

### 2.   *Defendants in Their Individual Capacities*

Defendants argue that they are entitled to qualified immunity for Short's claims against them in their individual capacities.  The Court addresses this argument as it relates to Kelly's alleged action of participating in Short's transfer.  As with regard to the other two claims of retaliation, the Court does not reach the qualified immunity argument because it finds that

Short's complaint fails to state a claim upon which relief can be granted as to these two alleged acts of retaliation.

a.      *Hull's Alleged Solicitation*

As stated above, in order to state a claim for retaliation, a plaintiff must allege, in addition to other elements, that the defendant took some adverse action against him or her, that was sufficient to deter a person of ordinary firmness from engaging in the protected conduct. While generally whether an adverse action is "sufficient" is a question of fact, as noted above, Courts agree that the action must have resulted in something more than a "trivial inconvenience" or "minor slight" against the plaintiff. *Hazel*, 933 F.Supp.2d at 890; *Wurzelbacher*, 675 F.3d at 584 ("when a plaintiff's alleged adverse action is 'inconsequential,' resulting in nothing more than a 'de minimus injury,' the claim is properly dismissed as a matter of law.") (*citing Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002).

Here, Short alleges that Hull solicited prisoners to assault him.  However, he conspicuously omits any allegation that he was ever actually assaulted or even threatened.  In his response brief, he argues that it does not matter whether or not he actually suffered an assault, but it is the action of soliciting such an assault that is the adverse action.  [21 at 9].  This is not sufficient.  Not only does Short fail to allege any injury, emotional or otherwise as a result of Hull's alleged solicitation, but none of his claimed damages, aside from possibly the punitive ones, relate to Hull's alleged actions (Short's damages include reinstatement for housing, prison job, back pay and parole consideration).  [1 at 3].  Because Short fails to allege more than an inconsequential adverse action, his claim against Hull must be dismissed for failure to state a claim upon which relief can be granted.  *Hazel*, 933 F.Supp.2d at 890; *Wurzelbacher*, 675 F.3d at 584.

b.      *Kelly's Writing of a Misconduct Ticket*

The same analysis also applies to Kelly's writing of a misconduct ticket in retaliation for Short's filing of a grievance against him.  While the parties' dueling affidavits as to whether Kelly's writing of a misconduct ticket was motivated by Short's filing of a grievance portray different version of the events, the Court need not reach this issue since the misconduct ticket was pulled shortly after its issuance, and Short does not allege that he suffered any consequences as a result.  [1 at 3].  He does not allege, for example, that the misconduct ticket resulted in any demotion or termination of his prison job, removal from the Warden's Forum or any other injury.  Both parties agree that no hearing was ever held on the misconduct ticket since it was pulled before any hearing could take place.  Because Short alleges no injury suffered as a result of this particular alleged conduct by Kelly, he has failed to state a claim upon which relief can be granted.  *See Porter v. Van Tatenhove*, 2011 U.S. Dist. LEXIS 152988, *28 (W.D. Mich. 2011) ("It is well established that a withdrawn misconduct charge is not an action that would deter a person of ordinary firmness.") (collecting cases); *Barry v. Norris*, No. 06-2638, 2008 U.S. Dist. LEXIS 73882, *20 (W.D. Tenn. Sept. 25, 2008) ("The filing of a discipinary write up for a minor infraction, which was withdrawn before any action was taken on it, is a *de minimis* action that does not rise to the level of an adverse action sufficient to deter a person of ordinary firmness from continuing to engage in protected conduct.").

c.      *Kelly's Alleged Participation in Short's Transfer*

Short alleges in his complaint that his transfer "was done at [Kelly's] request, even though [he] was employed in a sensitive position as Front House Porter, serving on the Warden's Form and was not due for an annual review and screening for months at the time [Kelly] completed the Transfer Screen."  [1 at 5].  At least on the record presently before the Court,

10

Short has sufficiently alleged an adverse action against Kelly with regard to the alleged participation in his prison transfer to survive Kelly's instant motion.

Generally, inmates have no inherent constitutional right to avoid transfer from one prison to another. *Olim v. Wakinekona*, 461 U.S. 238, 245-46 (1983). However, the Sixth Circuit has held that, despite this general principle, prison officials may not transfer a prisoner "as a means of retaliating against him for exercising his First Amendment rights." *Hill v. Lappin*, 630 F.3d 468, 473 (6th Cir. 2010). In *Hill*, the Sixth Circuit noted that prison transfers can constitute adverse action where the transfer "would result in foreseeable, negative consequences to the particular prisoner." *Id.* at 475 (citing *Siggers-el v. Barlow*, 412 F.3d 693, 701-702 (6th Cir. 2005). Short claims particular negative consequences from Kelly's alleged recommendation for transfer, including loss of status as a member of the Warden's Forum and loss of high status prison job as a front house porter. Therefore, Short has at least stated a claim for First Amendment retaliation in his being recommended for prison transfer, and the only remaining issue is whether Kelly has met his summary judgment burden of establishing the absence of a dispute of material fact as to this claim.

In support of his motion for summary judgment, Kelly submitted an affidavit wherein he states only that Short's transfer was part of a prisoner exchange, and refers the Court to the actual transfer documentation showing the same, which was approved by a non-party official, a transfer coordinator. [13-2 ¶ 6]. He then avers that "the transfer was not motivated in any part by [Short's] previous grievance. At no time did I retaliate against [Short]." (*Id.* ¶7). However, Kelly did not address the allegation in Short's complaint that Kelly improperly placed him into the "transfer pool" by subjecting him to a "transfer screen" that he was not otherwise scheduled to undergo. [1 at 5]. Moreover, Short explained in his response brief that (1) the fact that he had

11

not been due for a "transfer screen," (2) his prison employment as a Front House Porter, and (3) his participation on the Warden's Forum should have each, standing alone (let alone all three circumstances taken together), kept him out of the transfer pool. [21 at 5]. He further clarified the central allegation in his complaint with respect to this particular claim, explaining, "it was the placing of the plaintiff into consideration for transfer that constitutes the retaliatory action…" [*Id.* at 6]. In other words, Short made clear that his claim, and the facts he alleges to support it, relate to Kelly's actions *leading up to his transfer*, rather than the actual transfer order itself. Yet, Kelly's motion only addressed the latter issue, explaining that the actual transfer resulted from a prisoner swap. And, despite Short's clarification in his response, Kelly did not file a reply brief addressing those matters.

While the Court recognizes that Short did not provide any actual evidence in support of his position, in his response brief, he asserts that he had previously had a number of sworn statements of others to support his allegations that Kelly caused Short to be placed in the transfer pool and did so in retaliation for Short's filing of a grievance. Short claims that these sworn statements, and other supporting documentation, were lost or seized by the MDOC in his transfer out of the prison, and have not been recovered. He argues that if given the opportunity to re-obtain these statements, he can properly rebut Kelly's averments to the contrary. Importantly, discovery has not even commenced in this action.

At least on the present record, the Court finds that Short has sufficiently created a genuine issue of material fact such that summary judgment on this claim is not appropriate. This case is similar to the Sixth Circuit's decision in *Siggers-El v. Barlow*, 412 F.3d 693 (6th Cir. 2005). There, the defendant prison officer was alleged to have completed a transfer screen of the plaintiff inmate, in retaliation for his engaging in protected conduct. *Id.* at 697-98. The transfer

screen ultimately resulted in the prisoner's transfer, which cost him a high paying prison job and made it difficult for him to consult with his attorney due to geography. *Id.* at 698-99. The defendant in *Siggers-El* argued that the mere completion of a transfer screen was insufficient to constitute an adverse action because it did not, in and of itself, result in the prisoner's transfer. *Id.* at 701. The Sixth Circuit disagreed, finding that the mere

> fact that the Defendant's completion of a security screen of the Plaintiff was not a sufficient condition to transfer the Plaintiff, in that the transfer coordinator must ultimately approve the transfer, does not lead to the conclusion that the transfer cannot be imputed to the Defendant. Rather, the Defendant's performance of the security screen of the Plaintiff set in motion Plaintiff's transfer. That is, without the security screen he had the same chance as every other prisoner to be transferred. Thus, the Defendant filled out the screen knowing the effect it would have – that it would lead inexorably to the plaintiff's transfer, which is exactly what occurred.

*Id.*

Importantly, the Sixth Circuit devoted a not insignificant portion of its decision explaining, apparently based on "testimony" from the MDOC defendants, how the "annual screens," "transfer pools," and "transfer orders" work:

> Security classification screens (or transfer screens) are significant because a prisoner cannot be transferred until one is performed. These screens are filled out for two primary reasons. First, an "annual" screen is filled out to confirm that inmates are being housed at the appropriate security level. The annual screen is done on the anniversary date of the previous screen. It is triggered by the date alone, thus ensuring that all inmates are screened at least once a year. The second reason for filling out a security classification screen is in conjunction with a transfer. A transfer order— the document that actually authorizes the prisoner's movement—must be accompanied by a transfer screen to show that the prisoner is being moved to an appropriate level facility. As a result, the transfer screen is normally filled out when the prisoner is selected for transfer.

> Assistant Deputy Warden Roger testified that, apart from transfers for disciplinary or medical reasons, "99.9 percent of the time" transfers are done on a trade basis. Transfers conducted on a trade basis are usually initiated when one facility informs another that it needs additional

13

> prisoners.  At that point, the transfer coordinator at the receiving facility would let the resident unit managers know that a specific number of inmates are needed for an exchange.  If there are prisoners who have requested a transfer, they may already be in the "transfer pool."  Otherwise, it is the RUMs who select which inmates to transfer.  Although the transfer coordinator has ultimate authority to approve the transfer, if the selected inmates meet the transfer requirements, the transfer coordinator will not request different prisoners to trade.
>
> ADW Roger also testified that a RUM would normally prepare a transfer screen only after the transfer coordinator informed him that another facility requested a transfer.  A RUM would typically have no more than one week's notice of a transfer request before the transfer would need to occur.  Moreover, Roger testified, the transfer order would be prepared at or about the same time as the transfer screen and by the same person (that is, by the RUM).

*Id.* at 697-98.  As the *Siggers-El* opinion makes clear, the dates on which an inmate's transfer screen, trade request and transfer order take place may bear on the question of a claim like Short's.  *Id.* at 698 ("Barlow filled out a transfer screen on Siggers–El on February 2, 2001.  The transfer order, however, was not prepared until February 28, 2001.  As of February 2, 2001, Barlow could not show that any request for a trade had been relayed to him from the transfer coordinator.  Thus the evidence suggests, Siggers–El contends, that the reason why Barlow did not fill out a transfer order at the same time as the transfer screen was because no request for a transfer had yet been received by him.").

Here, Short alleged that Kelly completed a transfer screen in retaliation for his filing of a grievance against him.  He alleges that but for that screen, he would not have been transferred.  Just as the defendant did in *Siggers-El*, Kelly avers only that *the transfer itself* was not the result of retaliation.  While that may be true, it does nothing to refute Short's central allegation that Kelly completed a screen (which otherwise would not have occurred) in retaliation for Short's grievance for the purpose of placing him into the "transfer pool."  While Short has not offered any specific evidence to support his allegations that Kelly completed a transfer screen or that the

14

factors he cites would have made him generally ineligible for transfer, no discovery has been taken in this case, and Kelly failed to deny these particular contentions either in his motion or in a reply brief.[1]

Accepting Short's allegations as true that there is no other explanation for why someone in his position would be placed in the transfer pool given his coveted status and the fact that he was not due for review or screening at that time, and given the close proximity in time between the filing of the grievance and the transfer (less than two months after the filing of the grievance and one month after the grievance was pulled by the warden), the Court finds that Kelly has failed to show the absence of a material dispute of fact and that he is entitled to judgment in his favor as a matter of law.[2]  Fed. R. Civ. P. 56(a).

---

[1] While a party "may file a motion for summary judgment at any time until 30 days after the close of all discovery," it is inappropriate for him to do so before any discovery has taken place and then simply ignore specific relevant factual contentions raised in a response brief that could reasonably be fleshed out through discovery.  Here, if Short's contentions were off-base, *see infra*, fn. 2, then given the case's procedural posture as created by Kelly, it was incumbent upon him to file a reply brief addressing those matters.  Indeed, Kelly's counsel should be well aware of this in light of this Court's ruling in another case in which he unsuccessfully employed the same procedural technique.  *See Moore v. Warren*, No. 13-cv-11831, 2013 WL 6817307 (E.D. Mich. Dec. 24, 2013) (adopting R&R).

[2] The Court does not make any findings of fact as to the actual and/or allowable transfer procedures that applied in this instance, and whether they are the same or different than the ones explained in *Siggers-El*.  While Kelly's affidavit attaches several MDOC policy directives, including one related to transfers, those directives do not address how and when prisoners are screened and made available for transfer, or whether there is no such "screening" and all prisoners are simply equally available for transfer at any time.  Again, if Short's contentions as to his eligibility to be placed in the transfer pool are incorrect, then Kelly, as the party moving for summary judgment, should have addressed the specific relevant dates and procedures in his motion, or, at a minimum, in a reply brief.  *See supra*, fn. 1.  For whatever reason, he did not do so.  Thus, given the Court's lack of information on this point, the Sixth Circuit precedent in *Siggers-El*, and Short's *pro se* status, it must, at this juncture, take Short's allegations as true and draw all inferences in his favor.  Accordingly, summary judgment on his transfer claim is not appropriate, at least on the present record.  However, because the possibility still exists that Kelly may be entitled to summary judgment on this issue, the Court will recommend denying his instant motion without prejudice.

The Court also finds that Kelly is not entitled to qualified immunity on this claim because, as the Sixth Circuit articulated in *Siggers-El*, a reasonable officer should be aware that in certain factual circumstances, a transfer could deter a prisoner of ordinary firmness from engaging in protected conduct. While Short does not allege the severe negative consequences present in *Siggers-El*, i.e., the inability to pay for or frequently meet with his attorney, nor are Short's negative consequences so trivial as to be considered simply part of the routine of prison life. *See e.g. Jones v. Caruso*, 421 Fed. Appx. 550 (6th Cir. 2011) (transfer to facility that lacked smoke free housing insufficient to overcome defense of qualified immunity on question of adverse action). And, not all of the Sixth Circuit's decisions have required negative consequences that possess an inherently constitutional dimension. *See e.g. Pasley v. Conerly*, 345 Fed. Appx. 981, 985 (6th Cir. 2009) (holding that a threat to transfer the prisoner far away from the prisoner's family was an adverse action because it was foreseeable that his family would not be able to visit him). Thus, assuming the truth of Short's allegations, Kelly should have reasonably known that his completion of a transfer screen that ultimately resulted in Short's transfer would have the negative consequences of Short losing his allegedly high-status job as a front house porter and his position on the Warden's committee, and is therefore not entitled to qualified immunity on this claim.

### III.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS GRANTING IN PART** Defendant's Motion for Summary Judgment **[13]** and dismissing all claims against defendant Hull and the claim for retaliation in the form of a misconduct ticket against defendant Kelly. The Court **RECOMMENDS DENYING IN PART, WITHOUT PREJUDICE**, the motion as it relates to Short's claim for retaliation against Kelly for participating in his prison transfer.

16

Dated: July 23, 2014                          s/David R. Grand
Ann Arbor, Michigan                           DAVID R. GRAND
                                              United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record via email addresses the court has on file.

                                              s/Eddrey O. Butts
                                              EDDREY O. BUTTS
                                              Case Manager

Dated:  July 23, 2014